UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CORSO ENTERPRISES, INC., and ) <br> NATURAL PERFECTION, INC., ) <br> ) <br>     **Plaintiffs** ) <br> ) <br> v. ) <br> ) <br> SHOP AT HOME NETWORK, INC., ) <br> SUMMIT AMERICA TELEVISION, INC. ) <br> P. FLAVIN & ASSOCIATES, INC., and ) <br> PATRICIA FLAVIN, ) <br> ) <br>     **Defendants.** ) | No. 3:04-0260 <br><br> JUDGE TRAUGER |

## MEMORANDUM

Pending before the court is the Renewed and Supplemental Motion to Dismiss Plaintiffs' Tort-based Claims and to Strike Plaintiffs' Demand for Special, Indirect, Punitive, and Consequential Damages and Attorney Fees (Docket No. 38) filed by defendant Shop at Home Network, Inc. ("SATH") and defendant Summit America Television, Inc. ("Summit"), herein collectively referred to as "defendants SATH,"[1] to which the plaintiffs have responded (Docket No. 45) and defendants SATH have replied (Docket No. 50). Also before the court is the Plaintiffs' Motion for Reconsideration (Docket No. 83) requesting revision of the Memorandum and Order of the court dated September 27, 2004 (Docket Nos. 63, 64), to which the defendants Summit and the defendants P. Flavin & Associates, Inc. ("PFA") and Patricia Flavin have responded (Docket Nos. 95, 99).

---

[1] Because this Motion incorporates by reference the Motion to Strike originally filed by these defendants (Docket No. 11), the court, by order dated March 22, 2005 (Docket No. 101), termed the original Motion to Strike. Those arguments will be considered as incorporated into the Renewed and Supplemental Motion currently before the court. (Docket No. 38)

**I.	Factual Background**

The plaintiffs, Corso Enterprises and Natural Perfection, California and Nevada corporations respectively, are manufacturers of health and beauty products that are distributed for sale in a direct-television format, often through home-shopping networks.[2] Defendants SATH are Tennessee-based corporations and comprise a home shopping network that sells merchandise through televised sales presentations and other interactive electronic media.[3] Defendant PFA is a Tennessee corporation that provides on-air sales personalities for the televised sale of goods. Its chief representative is defendant Patricia Flavin.

On December 21, 2000, Corso entered into a Vendor Agreement with defendants SATH, whereby Corso agreed to develop and provide a private label product line exclusively for SATH, to be sold on the home shopping network.[4] (Docket No. 31, Amended Complaint ¶¶ 24, 116) The Vendor Agreement was signed by Alfonso Sosa Cordero ("Sosa") as president of Corso. (*Id.*, Ex. A p.1)

On March 1, 2001, Corso and PFA entered into an Agreement in which PFA agreed to provide Corso's on-air spokesperson for Corso's products and to maintain Corso's relationship

---

[2]Natural Perfection was established by Corso's owners in 2002, due to tax-related issues. Thereafter, Natural Perfection was assigned all of Corso's rights and duties with respect to the agreements with defendants SATH and the defendants PFA and Flavin.

[3]SATH America Television, Inc., is the successor in interest to SATH, as of October 30, 2002. As such, it has all rights, duties, and liabilities of SATH in this action.

[4]Following the assignment of Corso's rights to Natural Perfection, Natural Perfection and SATH entered into a Vendor Agreement on December 15, 2002. As the Natural Perfection Vendor Agreement is virtually identical to the Vendor Agreement entered into by Corso and SATH, the court will refer to the Agreements as one contract herein, "the Vendor Agreement."

with SATH.[5]  Thereafter, however, the plaintiffs contend that PFA and Flavin refused to sell Corso's product on the air, refused to permit any replacement spokesperson to sell the products when Flavin was absent, and failed to represent the plaintiff's best interests with SATH, all in contravention of their agreement.  (*Id.* ¶ 140)  According to the plaintiffs, SATH acted together with PFA and Flavin in declining to accept other persons to sell plaintiffs' products on television and in refusing plaintiffs air time to sell its products, as promised.  (*Id.*)

The plaintiffs also allege that, after execution of the Vendor Agreement, SATH persuaded it to develop and inventory additional SATH private label products, such as Perfect Greens, Perfect Nails, and anti-acne products, "by promising to use its good faith efforts to sell such products, without the intent to use its good faith efforts to sell such products."  (Docket No. 31, Amended Complaint ¶ 154)  According to the plaintiffs, SATH also represented that it would assist the plaintiffs in liquidating the inventory if it ceased to sell these products.  (*Id.* at ¶ 120)

In April of 2003, SATH terminated its contractual relationship with the plaintiffs and notified the plaintiffs that it would not make any attempts to liquidate the products provided by the plaintiffs.  (*Id.* ¶ 104)  As a result of SATH's actions, the plaintiffs claim to have approximately $3,975,600 (retail price value) in unsold inventory, which cannot be sold without authorization by SATH, pursuant to the exclusive right the plaintiffs gave SATH to sell the products.  (*Id.* ¶¶ 113–115)  Also in April of 2003, plaintiffs claim that SATH attempted to

---

[5]According to the Complaint, during the negotiation of the contract between Corso and PFA, general counsel for defendants SATH and the husband of defendant Patricia Flavin, George Phillips, represented Flavin and PFA.  According to the plaintiffs, at one point during the negotiations, Phillips called Mr. Sosa and threatened to cancel Corso's airtime with the home shopping network if Sosa did not agree to contract terms with PFA promptly.  (Docket No. 1 ¶ 22, 33, 34)

defraud the plaintiffs by alleging that SATH was owed an additional $58,886.54 from the plaintiffs based upon supposed SATH overpayments to the plaintiffs, when, in fact, SATH owed plaintiffs $5,161.33 for products shipped and unpaid. (*Id*. ¶¶ 107, 109) According to the plaintiffs, SATH substituted pages in the Vendor Agreement to reflect a 5% early payment discount, rather than the 3% discount that was actually agreed upon. (*Id*. ¶ 111)

## II.     Procedural History

On March 30, 2004, the plaintiffs filed a Complaint alleging a variety of claims against defendants SATH and defendants Flavin. On June 9, 2004, the plaintiffs submitted an Amended Complaint, alleging against SATH claims for breach of contract and money owed for goods sold and received, fraud, interference with the contractual and business relationship between plaintiffs and PFA, concert of action, and unfair or deceptive acts in violation of Tenn. Code Ann. § 47-18-104 (2001). Against defendant PFA, the plaintiffs brought claims of breach of contract and interference with the contractual and business relationship between plaintiffs and SATH. The plaintiffs also asserted an interference with the contractual and business relationship claim against defendant Flavin.

In response to the plaintiffs' Complaint and Amended Complaint, defendants PFA and Flavin filed Motions to Dismiss all claims (Docket Nos. 6, 34) or, in the alternative, a Motion for Summary Judgment (Docket No. 6). On May 4 and June 28, 2004, SATH moved to dismiss plaintiffs' fraud-based claims (Docket No. 11), as well as plaintiffs' remaining tort-based claims (Docket No. 38), and to strike plaintiffs' demand for special, indirect, punitive, and consequential damages and attorney fees (Docket No. 38). All defendants moved to strike

4

plaintiffs' jury demand on all claims. (Docket Nos. 13, 36)

On September 27, 2004, Senior Judge Wiseman, to whom the case was previously assigned, ruled on a majority of these motions, granting PFA's Motion to Dismiss plaintiffs' breach of contract claim due to the plaintiffs' failure to follow mandatory grievance procedures, denying PFA's Motion to Dismiss plaintiff's tortious interference claim, to which the mandatory grievance procedures did not apply, and denying PFA and Flavin's Motion to Dismiss plaintiff's concert of action claim. (Docket No. 64) The court, however, did dismiss the concert of action claim brought against defendants SATH, concluding that the unlawful purpose that SATH and PFA allegedly acted in concert to accomplish– tortious interference with the business relationship each independently had with the plaintiffs– "is a legal impossibility because 'a party to a contract cannot be held liable for procuring its own breach or termination of [its own] contract.'" (*Id*. p. 9) The court also rejected the plaintiffs' secondary argument that the concert of action claims were predicated on fraud "because the allegations contained in the conspiracy claim in no way suggest fraudulent conduct." (*Id*.) Finally, the court granted the defendants' Motion to Strike plaintiffs' jury demand as to all breach of contract claims and to the fraud claim against SATH, but denied the Motion to Strike plaintiffs' jury demand with respect to plaintiffs' tortious interference claims. (*Id*.)

Also in the September 27, 2004 Memorandum and Order, the court took under advisement SATH's Motion to Dismiss plaintiff's tort-based claims, as well as SATH's Motion to Strike the plaintiffs' demand for special damages.[6] Specifically, the court determined that,

---

[6]The court reserved judgment as to SATH's Motion to Strike Plaintiffs' Request for Special Damages, because it previously reserved judgment as to whether the plaintiffs in fact possessed valid fraud or tort-based claims to which special damages could apply, given the

5

because the defendants argued that the plaintiffs' claims sounding in tort were barred under both the statute of frauds and the economic loss doctrine, a central question (which the parties had failed to address) was whether the contract at issue was one for the sale of goods, thereby governed by the UCC and its related statute of frauds and economic loss doctrines, or a contract for services, not so governed. (Docket No. 63 p. 7–8) The court invited further argument on this issue and, on February 1, 2005, SATH submitted a Supplemental Memorandum to address the question. (Docket No. 82) On February 2, 2005, the plaintiffs filed a Hearing Brief on this question (Docket No. 88), as well as a Motion for Reconsideration of the court's September 27, 2004 Memorandum and Order (Docket No. 83). On February 3, 2005, a hearing was held on SATH's renewed Motion to Dismiss and to Strike. At this time, Judge Wiseman advised counsel that he had to recuse himself because of his relationship with Frank Woods, who appeared at the hearing on behalf of SATH. Thereafter, the case was transferred to this court.

### III.     Motion for Reconsideration

On February 2, 2005, the plaintiffs moved the court, pursuant to Federal Rule of Civil Procedure 54(b), to reconsider the Order and Memorandum issued on September 27, 2004. (Docket No. 83) Specifically, the plaintiffs request the court to revise the September 27, 2004 Order and accompanying Memorandum to provide: (1) that the plaintiffs' concert of action claim is reinstated; and (2) that plaintiffs are entitled to a jury determination on the issue of whether SATH committed the first material breach of the Vendor Agreement, such that SATH is not entitled to rely on limiting language of the Agreement with respect to the right to a jury trial or

---

economic loss and statute of frauds doctrines. (Docket No. 63 p. 10)

the limitation of damages; or, in the alternative, (3) for an Order allowing plaintiffs additional time to conduct discovery relevant to its claim that SATH committed the first material breach of the Vendor Agreement.  (*Id.*)

The Court of Appeals for the Sixth Circuit has observed that the "Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders" but has provided that "[d]istrict courts have authority under common law and Rule 54(b) to reconsider interlocutory orders and reopen any part of a case before entry of final judgment." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, No.02-5601, 2004 WL 237651, at *8 (6th Cir. Feb. 6, 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1272, 1282 (6th Cir. 1999)).  "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citing *Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998).    In this case, the plaintiff filed its motion for reconsideration on February 2, 2005, one hundred and twenty-eight calendar days after the entry of the court's September 27, 2004 decision granting, in part, SATH's Motion to Dismiss.  The motion for reconsideration clearly is untimely under Local Rule 8(b)(3), which requires that motions for reconsideration be filed within twenty days of service of the court's decision on a motion for summary judgment and within ten days of service of all other decisions.  Local Rule 8(b)(3); *see also Al-Sadoon v. FISI\* Madison Fin. Corp*, 188 F. Supp. 2d 899, 901–02 (M.D. Tenn. 2002).

Even if it were not untimely, the court would deny the motion on its merits.  In support of its motion for reconsideration, the plaintiffs do not rely upon an intervening change in controlling law or material facts or controlling law that were presented by them in their prior

7

motion and that would result in a different disposition. With respect to the concert of action claim, the plaintiffs simply reargue the assertions originally made in response to the defendants' motion to dismiss. As stated above, such reargument is insufficient grounds for the granting of a motion for reconsideration.

As for the court's finding of a valid waiver of the plaintiffs' right to a jury trial with respect to causes of action arising out of contract, the plaintiffs simply assert that the court overlooked an affidavit submitted by the owner of SATH, Sosa, which states that the waiver was not knowing and voluntary. The Sosa affidavit, however, does not contain material facts that would result in a different disposition. As the court noted in its September 27, 2004 Memorandum and Order, "even if the Plaintiffs had included sworn statements to support its motion, a mere claim that the waiver provision was not seen or understood is 'insufficient to overcome an inference from the objective circumstances surrounding the signing of the contract that the waiver was in fact knowing and voluntary.'" (Docket No. 63 p. 12 n.12) The court then went on to evaluate the objective circumstances, finding that the waiver was indeed knowing and voluntary.

Finally, the plaintiffs do attempt to rely upon allegedly newly discovered evidence that was previously unavailable, contending that "discovery obtained since September 27, 2004 evidences that Shop at Home Network, Inc. through itself or its successor SATH America Television, Inc., (collectively "SATH") were the first to breach the Vendor Agreement; therefore, under Tennessee law SATH may not enforce the terms of the Vendor Agreement." (Docket No. 83) Yet, even if the defendants were the first to breach the Vendor Agreement, the theory of first breach is not appropriate for use by the plaintiffs *offensively*. The theory of first

8

breach provides that "there can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract." *United Brake Systems, Inc. v. American Environmental Protection, Inc.*, 963 S.W.2d 749, 756 (Tenn. App.1997) (quoting *Santa Barbara Capital Corp. v. World Christian Radio Found. Inc*., 491 S.W.2d 852, 857 (Tenn. App. 1972)). Thus, the theory of first breach is traditionally used *defensively* in connection with a breach of contract claim. Because SATH is not attempting to recover from the plaintiffs for damages on a breach of contract theory, the first breach theory does not apply.

Finally, even if the theory could be used offensively, plaintiffs have failed to offer a transparent explanation, supplemental to its vague assertion that additional discovery revealed a first breach, as to why this "offensive defense" could not have been raised before. *See Hartsfield v. Vidor*, 199 F.3d 305, 308 (6th Cir. 1999) (holding that district court properly declined to address issue raised only in motion for reconsideration). For the foregoing reasons, the plaintiffs' Motion for Reconsideration will be denied.

**IV.     Motion to Dismiss Plaintiffs' Tort-based Claims**

A. *Standard of Review*

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will accept as true the facts as the plaintiff has pleaded them. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002); *Performance Contracting, Inc. v. Seaboard Surety Co.*, 163 F.3d 366, 369 (6th Cir. 1998). "A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Performance Contracting*, 163 F.3d at 369.

9

The court will not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Myers v. United States*, 636 F.2d 166, 168-69 (6th Cir. 1981) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  This narrow inquiry is based on whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "Indeed it may appear on the face of the pleadings that recovery is very remote and unlikely but that is not the test."  *Scheuer*, 416 U.S. at 236.

Rather, challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56."  *Swierkiewicz*, 534 U.S. at 514.

Federal Rule of Civil Procedure 8 establishes a "liberal system of notice pleading." *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001).  Under this liberal system, the Rules "do not require a claimant to set out in detail the facts upon which he bases his claim.  To the contrary, all the Rules require is a 'short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Id.* (quoting *Conley*, 355 U.S. at 47).

B. *SATH's Arguments for Dismissal pursuant to Rule 12(b)(6)*

In its original Motion to Dismiss (Docket No. 11), which is incorporated by reference in the renewed Motion (Docket No. 38), SATH argued that plaintiffs failed to state a claim for common law promissory fraud or violations of the Tennessee Consumer Protection Act because the Complaint did not allege that SATH made express promises to use a good faith effort in the

10

sale and promotion of plaintiffs' additional products. SATH further asserted that, under Tennessee law, no cause of action for promissory fraud exists with respect to an implied promise, and, because no cause of action for fraud existed, there was no valid policy reason to find a violation of the TCPA. Plaintiffs, however, responded that, indeed, SATH did make express, affirmative representations after the Vendor Agreement was signed, by promising to use its best efforts for the sale and promotion of the additional products. According to the plaintiffs, these promises were made in order to induce the plaintiffs into developing and providing additional private label products to SATH. The Amended Complaint filed by plaintiffs (Docket No. 31) contains these factual assertions, thereby mooting the defendants' original arguments.

Now, SATH argues primarily that the Vendor Agreement is a contract for the sale of goods rather than for services and, as a result, the UCC and its related legal doctrines– specifically, the economic loss doctrine[7] and the statute of frauds– apply, barring plaintiffs' tort-

---

[7]The economic loss doctrine provides that, "[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract." *Trinity Industries, Inc., v. McKinnon Bridge Co., Inc*., 77 S.W.3d 159, 171 (Tenn. Ct. App. 2001) In *Trinity Industries*, the court explained that the economic loss doctrine "was created by courts to avoid the 'coming collision between warranty and contract on the one hand and the torts of strict liability, negligence, fraud, and misrepresentation on the other.'" 77 S.W.3d at 171 (citing James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-5, 580 (4th ed. 1995)). Under Tennessee law, "[t]he economic loss doctrine draws the line between tort and warranty by barring recovery for economic losses in tort actions," *id*., and helps ensure that contract claims are resolved by contract law. *Dinsmore Instrument Co. v. Bombardier, Inc*., 199 F.3d 318, (6th Cir. 1999). Citing Michigan law, the Sixth Circuit has stated that, "[i]f a commercial purchaser were allowed to sue in tort to recover economic losses, the UCC provisions designed to govern such disputes ... could be entirely avoided.... In any event, Article 2 would be rendered meaningless and ... contract law would drown in a sea of tort." *Dinsmore*, 199 F.3d at 320 (citing *Neibarger v. Univ. Cooperative, Inc*., 486 N.W.2d 612, 618 (Mich. 1992) (internal quotations omitted)). Thus, governance by the UCC of the contract at issue is a prerequisite to the application of the economic loss doctrine and resulting preclusion of recovery in tort.

11

based claims, including its remaining claims for promissory fraud and interference with contract. The legitimacy of this argument, and the success of the defendants' Motion to Dismiss, turns on whether the Vendor Agreement may appropriately be categorized as a contract for the sale of goods.

C. *Application of the UCC to the Vendor Agreement*

In determining whether a contract is governed by the UCC, Tennessee has adopted the "predominant factor" approach. *Hudson v. Town and Country True Value Hardware*, 666 S.W.2d 51, 53–54 (Tenn. 1984). Under this test, if the essential bulk of the assets to be transferred qualifies as "goods," then it is appropriate to characterize the transaction as one for the sale of goods, and the UCC governs; if the predominant assets are non-goods, then the UCC has no application. *Id.* Here, the plaintiff admits that the contract at issue is a mixed contract for both goods and services but contends that the services aspect predominates. The plaintiffs assert that the primary purpose of the agreement between the plaintiffs and SATH was for SATH to provide airtime, Internet outlets, advertising, and other marketing and collection services to the plaintiffs so that plaintiffs could sell their products to others. Thus, according to the plaintiffs, the UCC does not govern, and the economic loss doctrine has no bearing on the plaintiffs' tort-based claims.

The Vendor Agreement, read as a whole and in its entirety, supports the plaintiffs' position. The very first section of the Vendor agreement states that, "Shop at Home agrees to *allow the Vendor to sell* certain Products over its television shopping network, its Internet sites, ... and any affiliated Internet sites on the terms described herein." (Docket No. 31, Ex. A. § 1) (emphasis added). Likewise, in the "Exclusivity" portion of the contract, SATH acknowledges

12

the "agreement of Shop at Home to sell the Products over the Network and Collectibles.com will involve a decision of Shop at Home to invest its time and resources in such sales efforts including the commitment of airtime, to the exclusion of other sales opportunities." (*Id*. § 5) While there are certain portions of the Vendor Agreement that suggest that the contract involves the sale of goods (including the fact that SATH calls itself a "purchaser"), the bulk of the assets transferred do not qualify as "goods." Under the Agreement, SATH did not acquire title to the products sold over the network at any time, nor did the risk of loss over such products rest with it. For example, the Vendor Agreement explicitly states that the Vendor– the plaintiffs– is responsible for shipping directly to the customer any missing or broken products at no additional cost and that SATH is not liable for any loss or damage done, as a result of fire, theft, or other casualty, to products that SATH may allow Vendor to store on SATH's premises.

Under these facts, the court finds that the main purpose of the agreement was the sale to Corso of SATH's airtime, collection services, and additional resources, including access to SATH's retail customers (of whose information SATH retained exclusive ownership pursuant to Section 17 of the Agreement). Therefore, the Vendor Agreement is not a contract for the sale of goods governed by the UCC and, consequently, neither the economic loss doctrine nor the UCC statute of frauds operates to bar plaintiffs' tort-based claims.[8]

D. *Promissory Fraud Claim*

---

[8]The parties make much of whether the plaintiffs' promissory fraud claim may be designated a claim for negligent misrepresentation. Whether fashioned as a claim based on promissory fraud or a claim of negligent misrepresentation, the economic loss doctrine and the statute of frauds are inapplicable because the UCC does not govern the contract between the parties.

13

In addition to the aforementioned arguments, SATH contends that the plaintiffs' promissory fraud claim should be dismissed because the plaintiffs allege only circumstantial facts to support its claim and, under Tennessee law, promissory fraud must be proven through direct evidence of false present intent. (Docket No. 39 p. 7) In Tennessee, an action for promissory fraud has four elements: (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the falsity of that representation, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damages, and (4) that the misrepresentation embodies a promise of future action without the present intention to carry out the promise." *Shahrdar v. Global Hous.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998).

While it is true that "[e]vidence of the lack of present intent to perform a promise in a future contract must be demonstrated by something other than a mere failure to keep the promise or the subjective impression of the promisee," *Burton v. Hardwood Pallets, Inc*., 98-C-1394, 2004 WL 572350, *2 (Tenn. Ct. App. March 22, 2004) (unpublished), the liberal notice pleading system does "not require a claimant to set out in detail the facts upon which he bases his claim," *J.H. Routh Packing Co.*, 246 F.3d at 851 (quoting *Conley*, 355 U.S. at 47), and the court will not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Myers*, 636 F.2d at 168-69 (quoting *Conley*, 355 U.S. at 45-46 ). This narrow inquiry is based on whether "the claimant is entitled to offer evidence to support the claims," not on whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz*, 534 U.S. at 511(quoting *Scheuer*, 416 U.S. at 236). Thus, while the plaintiff may ultimately not succeed in producing satisfactory evidence of false intent, such a determination is not appropriate for resolution on a motion to dismiss, where

14

the court is required to accept all of the allegations of the Amended Complaint as true.

The defendants also assert that the plaintiffs' promissory fraud claim cannot stand because the alleged oral representations made to the plaintiffs were not written down, as required by the integration and modification provision of the Vendor Agreement. While the defendants' argument is unclear, the court interprets it as one that the promissory fraud claim must be dismissed because, in light of the integration and modification provision of the Vendor Agreement, the plaintiffs' reliance on the defendant's alleged subsequent oral representations was unreasonable as a matter of law.

Here, the plaintiffs allege that, after execution of the Vendor Agreement, SATH persuaded it to develop and inventory additional SATH private label products, such as Perfect Greens, Perfect Nails, and other anti-acne products, "by promising to use its good faith efforts to sell such products, without the intent to use its good faith efforts to sell such products." (Docket No. 31, Amended Complaint ¶ 154) According to the plaintiffs, SATH also represented that it would assist the plaintiffs in liquidating the inventory if it ceased to sell these products. (*Id*. at ¶ 120) While a reasonable juror might conclude, in light of the integration and modification provision of the Vendor Agreement, that the plaintiffs' reliance on SATH's oral representations subsequent to the Vendor Agreement was unreasonable, the question of justifiable reliance is one of fact, rather than law. *See Nichols v. A.B. Colemans, Inc.,* 652 S.W.2d 907, 908 (Tenn. App.1983) (finding error by the trial judge in withdrawing question of reasonable reliance from the jury in a fraud case); *Marine Midland Bank, N.A. v. GMAC,* No. 03A01-9502-CV-00060, 1995 WL 417047 at *7 (Tenn. Ct. App. July 17, 1995) (holding that reasonable reliance is a question of fact for the jury to decide). Thus, the plaintiffs' allegations of reasonable reliance

15

are sufficient to survive a motion to dismiss.

## V.     Motion to Strike Plaintiffs' Demand for Special Damages

In the Amended Complaint, the plaintiffs' prayer for relief includes, among other things, a demand for special, indirect, punitive, and consequential damages and attorney's fees. (Docket No. 31 p.25)  According to SATH, the plaintiffs may not recover these damages because the Vendor Agreement contains an explicit waiver of the vendor's special, indirect, punitive and consequential damages and attorney's fees "arising from a breach or alleged breach of this agreement." (Docket No. 31, Exh. A § 42)  In response, the plaintiffs imply that these damages are sought only with respect to their tort claims, and not their breach of contract claims.  The plaintiffs also argue that this damages waiver provision of the Vendor Agreement is unenforceable because the entire Vendor Agreement is an oppressive, unconscionable adhesion contract, lacking in mutuality.

The court has previously found that there is little support for the plaintiffs' latter argument. (Docket No. 63 p. 10)  However, to the extent the waiver provision seeks to exculpate SATH from liability for intentional conduct, recklessness, or gross negligence, such a provision is unenforceable as against public policy. *Childress v. Madison County*, 777 S.W.2d 1, 5 (Tenn. Ct. App. 1989); *Adams v. Roark*, 686 S.W.2d 73, 75–76 (Tenn. 1985).  By its explicit terms, however, the damages waiver provision applies only to damages "arising from a breach or alleged breach of this agreement."  The plaintiffs' tort claims do not so arise, and the plaintiffs are entitled to seek special, indirect, punitive and consequential damages under their valid tort-

16

based claims, if such damages are available.[9] Thus, SATH's Motion to Strike the plaintiffs' demand for special, indirect, punitive and consequential damages and attorney's fees will be denied with respect to plaintiffs' tort claims.

## VI.     Conclusion

For the foregoing reasons, defendant SATH's Motions to Dismiss Plaintiffs' Tort-based Claims will be denied and SATH's Motion to Strike Plaintiffs' Demand for Special Damages will be denied as to plaintiffs' tort claims. The plaintiffs' Motion to Reconsider will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

---

[9] However, if the plaintiffs successfully assert both a statutory cause of action for intentional inducement to breach under Tenn. Code. Ann. § 47-50-109, which permits the recovery of treble damages, as well as a punitive damages claim in its common law action for tortious interference with contract, the plaintiffs must elect between remedies. *Buddy Lee Attractions v. William Morris Agency*, 13 S.W.3d 343, 355–56 (Tenn. Ct. App. 1999).